UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT LEE ELLIS,<br><br>   Petitioner,<br><br>v.<br><br>MARTIN BITER,<br><br>   Respondent. | Case No. 1:17-cv-01443-DAD-JDP<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR A WRIT OF HABEAS CORPUS<br><br>OBJECTIONS DUE WITHIN FOURTEEN DAYS<br><br>ECF No. 1 |

Petitioner Robert Lee Ellis, a state prisoner without counsel, seeks a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner claims constitutional violations arising from juror misconduct, flawed jury instructions, and cumulative error. Respondent argues that the petition is without merit because there was no violation of clearly established federal law. ECF No. 20 at 9. We recommend that the court deny the petition for the reasons stated below.

**I. Background**

Petitioner challenges his conviction and sentence arising from a shooting. ECF No. 1 at 11. The set of events leading to the shooting began with a parking lot argument between petitioner and one Sumnler Townsend. *People v. Ellis*, No. F066937, 2015 WL 159251, at *2 (5th Cal. Ct. App. Jan. 13, 2015). The day after the argument, Townsend and two others set out in a car to find petitioner. When they eventually located him, petitioner fired a gun multiple times at Townsend's car, injuring the two passengers—though not Townsend, who was driving. At

1

trial, the jury found petitioner guilty of three counts of attempted murder, three counts of assault with a firearm, and one count of discharging a firearm at an occupied vehicle. Additionally, the jury found to be true the special allegations that petitioner (1) personally used a firearm, (2) personally and intentionally discharged a firearm that proximately caused great bodily harm, and (3) personally inflicted great bodily injury upon two victims. The Superior Court of Kings County sentenced petitioner to 92 years to life in state prison, plus 35 years. On direct appeal, the California Court of Appeal, Fifth District ("Court of Appeal") affirmed. The California Supreme Court summarily denied review.

The following facts are drawn from the opinion of the Court of Appeal of the State of California, Fifth Appellate District ("Court of Appeal"), and a presumption of correctness applies to them. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015). An independent review of the record warrants the adoption of the following facts as a fair and accurate summary of the underlying offenses. *See Nasby v. McDaniel*, 853 F.3d 1049, 1054-55 (9th Cir. 2017).

> Townsend testified that around 2:00 p.m. on April 18, 2011, he drove to a parking lot on Irwin Street where "everybody hung out." He noticed a group of about seven or eight children, ranging in age from 10 to 16 years old. The children were staring at Townsend and "looking real violent like something was wrong." Townsend asked the children what was wrong with them and "shooed all the kids off." He thought about the situation and went to apologize to the children for telling them to leave. Then Townsend approached Ellis and asked him why he told "the kids to jump on me." Ellis responded, "Man, what, what you want to do?" Townsend understood this to mean Ellis wanted to fight . . . . Ellis walked to his car saying he would show Townsend something, which Townsend understood to mean Ellis had a pistol. Townsend said, "Don't play with me with no pistols." Ellis put on white gloves. Townsend said: "Man, if you want to fight, you one that called me out to a fight. If you want to fight let's fight, we don't get pistols on each other." Townsend, however, did not see a pistol. Ellis got in his car and drove away.
>
> Townsend, his brother Curry, and Walker headed out to look for Ellis in Curry's gray Chevy Malibu . . . . [T]hey saw Ellis at Houston Avenue and 11th Avenue. Ellis was in a blue Mustang

with Scott and Patterson . . . . Later the same day, around 5:00 or 6:00 p.m., Townsend saw Ellis in the blue Mustang again. Townsend was in the gray Malibu; Curry was driving, Townsend was in the front passenger seat, and Walker was in the back. Townsend and his companions were traveling eastbound on Home Avenue and the Mustang turned onto Home traveling westbound. The cars passed each other, and then each car made a U-turn. The two cars stopped on the street next to each other, with the driver's side of the Malibu facing the driver's side of the Mustang. Walker talked to Ellis, who was sitting in the back seat of the Mustang, while Townsend talked with someone on his cell phone. The driver's window of the Mustang was rolled down. When Townsend heard Ellis say, "'They talking about killing me,'" Townsend got off the phone and said to Ellis, "'Ain't nobody talking about killing you'" and "'You the only one talking about fighting and killing.'" Townsend was trying to defuse the situation. He testified: "I was talking to him and I was telling him that you don't want to go there with your big homies. You don't get no guns and try to shoot us." At that time, Townsend and his companions did not know there were guns in the Mustang. There were no weapons in the Malibu. Ellis responded, "Nah, nah, nah." Townsend said, "you don't want to go there in Hanford," and then "[Ellis] said, 'Shut up, shut up, nigger,' and go to shooting." Ellis pointed a gun out of the Mustang and everyone in the Malibu ducked. Townsend heard shooting for about 15 seconds. He thought there were over 20 shots. He heard two sets of shots that sounded different from each other.

After the shooting stopped . . . Curry was bleeding from his left ankle, and Walker had been shot in the back . . . . Townsend, his wife, and Curry drove to the hospital in Townsend's Chevy Impala. Walker went to the hospital separately with his wife.

Detective Rachel Morales from the Kings County Sheriff's Office conducted an interview with Walker two days after the shooting, and an audio recording of the interview was played for the jury. In the interview, Walker reported he was in a car with Curry and Townsend, and Townsend was trying to flag down a blue Mustang. Townsend was trying to talk to the people in the Mustang and "get the situation straight." Walker saw the Mustang make a U-turn. He identified Ellis, Scott, and Patterson as the occupants of the Mustang. Ellis or Scott said, "you lookin' for me." Walker rolled down his window and said, "hey man these dudes ain't comin' down here to look for you" and "we['re] folks . . . [Ellis's] grandmother is in the house with my grandmother right now." Walker told them his word was good and they "need to talk this out." Townsend told Ellis that Ellis was the one talking about getting a gun. Walker said no one in the Malibu had a gun. He

3

> said, "let's talk this out," and Townsend agreed. Then Ellis or someone else in the Mustang said, "shut up," and "fuck you niggas" and the shooting began. Ellis, sitting in the backseat of the Mustang, shot at them with a chrome automatic pistol.
>
> The Kings County Sheriff's Office took possession of the gray Malibu on April 20, 2011, and processed it for evidence. A deputy sheriff testified there appeared to be about six bullet impact marks on the windshield, a bullet hole in the driver well, six holes in the driver's door, a bullet hole on the driver's side rear door, and another bullet hole in the quarter panel on the driver's side. Metal fragments were found in a door panel, a bullet was recovered from the driver's door area, and seven fragments were recovered from the rear area. The Malibu was swabbed for gunshot residue testing, and a criminalist found lead particles in the samples. This result is not inconsistent with a firearm having been shot in the vehicle, but it is also consistent with the vehicle being shot at, as lead particles disperse when a bullet hits the hard surfaces of a vehicle such as metal and glass.
>
> A Visalia police officer discovered the blue Mustang in Visalia a day after the shooting. The car had been reported stolen, and it was found partially on the sidewalk with the driver's side window broken and a flat tire. There were no bullet holes on the car and no damage to the interior. A nine-millimeter shell casing was found underneath the driver's seat. Samples were taken for gunshot residue testing. A criminalist found many particles with lead, antimony and barium, which is characteristic of the discharge of a firearm.

*Ellis*, 2015 WL 159251, at *1-4.

## II. Discussion

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, governs a state prisoner's habeas petition. *See* § 2254; *Harrington v. Richter*, 562 U.S. 86, 97 (2011); *Woodford v. Garceau*, 538 U.S. 202, 206-08 (2003). To decide a § 2254 petition, a federal court examines the decision of the last state court to have issued a reasoned opinion on petitioner's claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The standard

that governs our review of the state court's decision depends on whether the state court adjudicated petitioner's claims on the merits.

When a state court has adjudicated a petitioner's claims on the merits, a federal court reviews the state court's decision under the deferential standard of § 2254(d). Section 2254(d) precludes a federal court from granting habeas relief unless a state court's decision is (1) contrary to clearly established federal law, (2) a result of an unreasonable application of such law, or (3) based on an unreasonable determination of facts. *See* § 2254(d); *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018). A state court's decision is contrary to clearly established federal law if it reaches a conclusion "opposite to" a holding of the United States Supreme Court or a conclusion that differs from the Supreme Court's precedent on "materially indistinguishable facts." *Soto v. Ryan*, 760 F.3d 947, 957 (9th Cir. 2014) (citation omitted). The state court's decision unreasonably applies clearly established federal law when the decision has "no reasonable basis." *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011). An unreasonable determination of facts occurs when a federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Loher v. Thomas*, 825 F.3d 1103, 1112 (9th Cir. 2016). The petitioner must show that the state court's decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

If obtaining habeas relief under § 2254 is difficult, "that is because it was meant to be." *Richter*, 562 U.S. at 102. As the Supreme Court has put it, federal habeas review "disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Id*. at 103 (citation omitted). Our habeas review authority serves as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id*. at 102-03 (emphasis added).

Here, petitioner raises four habeas claims: (1) the trial court violated his constitutional rights when it denied his motion for a new trial due to juror misconduct; (2) the trial court

violated his constitutional rights when it failed to give an imperfect self-defense jury instruction; (3) the trial court's supplemental jury instruction was coercive, violating petitioner's constitutional rights; and (4) the cumulative effect of the trial court errors warrants reversal. The Court of Appeal rejected all of petitioner's claims on the merits. The California Supreme Court denied review. This court reviews the last reasoned opinion—here, that of the Court of Appeal. Because the Court of Appeal rejected all claims on the merits, the deferential standard of § 2254 applies to all claims. We review each claim in turn.

### A. Juror misconduct

Petitioner argues that the trial court erred in denying his request, based on claimed juror misconduct, for a new trial, and thus violated his constitutional rights. ECF No. 1 at 12. Strikingly, petitioner argues that a juror's comments *in petitioner's favor* prejudiced his defense. Specifically, he alleges that his rights were violated when juror number 90602: (1) failed to disclose his acquaintance with petitioner's cousin[1] and (2) both communicated with petitioner's cousin about the progress of jury deliberations and failed to disclose this communication to the trial judge. *Id*. at 13-14. At the hearing on petitioner's motion for a new trial, petitioner argued that the juror's actions were prejudicial to his defense. *See* RT 14:2305.[2] At the hearing, petitioner presented a declaration from Williams, his cousin, which stated that the juror had contacted Williams during both the trial and jury deliberations and told Williams that he was on the jury, the evidence was in petitioner's favor, and younger jurors were being coerced by older jurors. ECF No. 1 at 13-14. The trial court found (1) that petitioner had not been prejudiced by the misconduct because the juror in question spoke in support of petitioner, (2) that the pressure experienced by younger jurors did not affect the outcome of the trial, and (3) that the trial court's poll of each individual juror protected against prejudice. RT 14:2309-10.

The Sixth Amendment guarantees a fair trial by a panel of impartial jurors to criminal defendants. U.S. Const. amend. VI. However, the Constitution "does not require a new trial

---

[1] The juror knew petitioner's cousin, Williams, from his childhood. ECF No. 1 at 14.
[2] All "RT" citations refer to the reporter's transcript. All "CT" citations refer to the clerk's transcript. Respondent has lodged these documents with this court. *See* ECF No. 21.

every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). "It is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Id*. The Supreme Court has long held that "[a litigant] is entitled to a fair trial but not a perfect one, for there are no perfect trials." *Brown v. United States*, 411 U.S. 223, 231-32 (1973). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith*, 455 U.S. at 217. Although "a criminal defendant is arguably entitled to an independent juror with no biases" either for or against the defendant, we do not see how a juror's favorable inclination toward defendant could infringe that defendant's constitutional rights. *See Hernandez v. Poole*, 109 F. Supp. 2d 1177, 1185 (9th Cir. 2000) (finding no evidence of "anything that could judicially be called 'bias,'" where the bias was "in favor of petitioner and not against her").

### 1. Voir dire

Petitioner alleges that the juror in question, number 90602, lied during voir dire when he failed to disclose that he knew petitioner's cousin, Williams, from childhood.[3] ECF No. 1 at 12. A petitioner must "first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause" to be granted relief. *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984). "Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause." *Id*. at 554. "Challenge for cause is narrowly confined to instances in which threats to impartiality are admitted or presumed from the relationships, pecuniary interests, or clear biases of a prospective juror." *Darbin v. Nourse*, 664 F.2d 1109, 1113 (9th Cir. 1981); *see McDonough*, 464 U.S. at 556 ("The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.").

---

[3] Petitioner does not state or imply that juror 90602 personally knew him, only that the juror knew Williams, his cousin. ECF No. 1 at 12.

7

Here, the potential jurors were instructed during voir dire to disclose any biases or prejudices that they may have had regarding the case. *See* RT 1:4. The jurors were not asked whether they knew any relatives of the petitioner, but rather whether they were "acquainted with the defendant or any of the attorneys" in the matter. *See* RT 1:13. When the court questioned juror 90602 individually, the court did not ask whether he knew any of petitioner's relatives, and juror 90602 did not volunteer that he knew petitioner's cousin.[4] *See id*. Juror 90602 was individually questioned about his ability to decide the case impartially, to which he answered, "I go with my own instinct." *See id.* at 84. Petitioner has not shown that juror 90602 "failed to answer honestly a material question on voir dire." *See McDonough*, 464 U.S. at 556.

Even if petitioner could show that juror 90602 lied during voir dire, he cannot show that "a correct response would have provided a valid basis for a challenge for cause." *See id*. Challenges for cause are proper in cases of actual or implied bias. The threshold that petitioner must pass over to establish actual bias is "extremely high." *See Wainwright v. Witt*, 469 U.S. 412, 443 (1985). Actual bias does not arise from the existence of a certain relationship, but rather is found when a juror makes it "unambiguous" or "unmistakably clear" that their personal views would "prevent or substantially impair them from following the law." *Id*. (stating that the relevant inquiry is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath"). Disclosure of the juror's relationship with petitioner's cousin alone would not have given rise to a finding of actual bias.

Bias can be implied, but only in circumstances even more extreme than those found in instances of actual bias. *See Smith v. Phillips*, 455 U.S. 209, 222 (1982) (Examples of implied bias include where a juror is "an actual employee of the prosecuting agency, . . . a close relative of one of the participants in the trial or the criminal transaction, or . . . a witness or somehow involved in the criminal transaction."). Bias may be implied when the case presents a relationship in which the "potential for substantial emotional involvement, adversely affecting impartiality," is

---

[4] It stands to reason that juror 90602 was at the very least familiar with the petitioner, to the extent that he knew Williams was petitioner's cousin.

8

inherent. *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990). Although courts "should hesitate before formulating categories of relationships which bar jurors from serving in certain types of trials," if the nature of the relationship and circumstances make it "highly unlikely that the average person could remain impartial in his deliberations under the circumstances," a finding of implied bias may be appropriate. *Id*.

Here, petitioner has failed to present any evidence that the nature of the relationship between the juror and Williams was one of substantial emotional involvement that would make the juror's impartiality highly unlikely. Moreover, as discussed *infra*, the nature of the juror's comments about petitioner reveal that the juror was *in favor of*, or at the very least, neutral towards petitioner. Therefore, even if the juror had revealed his relationship to Williams on voir dire, this would not have been grounds for a challenge for cause.

### 2. Juror's contact with petitioner's cousin

Petitioner alleges that the juror in question contacted his cousin Williams three times during the trial and jury deliberations and indicated that he was on the jury, that the evidence weighed in petitioner's favor, and that he and another juror were being pressured to change their vote.[5] *See* ECF No. 1 at 14.

"[A]ny private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229 (1954). Communication between jurors and third persons invalidates the verdict unless harmlessness is shown. *See Mattox v. United States*, 146 U.S. 140, 149 (1892), *called into doubt on other grounds by Warger v. Shauers*, 574 U.S. 40 (2014). The presumption of prejudice is not conclusive and the "burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Id*.

---

[5] Petitioner does not develop an argument regarding the alleged coercion of the younger jurors by older jurors in his habeas petition. However, this argument was considered at the trial court hearing on petitioner's motion for a new trial. RT 14:2310. The trial judge found no bias because the judge polled the individual jurors—including Williams—asking them whether the verdict was their true and correct verdict. Each juror answered affirmatively. *Ellis*, 2015 WL 159251, at *5.

9

In *Godoy*, the Ninth Circuit created a relevant framework for analyzing juror contact, by combining the analyses of *Mattox* and *Remmer*. The defendant must first present evidence of a contact "sufficiently improper as to raise a credible risk of affecting the outcome of the case." *Godoy v. Spearman*, 861 F.3d 956, 967 (9th Cir. 2017). If the defendant is unable to do so, he is not afforded a new trial.[6] The burden petitioner must meet is a "low threshold"; he must provide evidence of an external contact that has a "tendency to be injurious" to the petitioner. *Tarango v. McDaniel*, 837 F.3d 936, 947 (9th Cir. 2016). Petitioner falls short of this threshold, low though it may be, since he has failed to show how the contact was injurious to him.

Most importantly here, the content of the communications reveal no prejudice. *See Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 858 (2017) (finding that a jury member's statement to other jurors that all Mexicans are violent to their spouses demonstrated prejudice). Here, the juror's comments included that the evidence was weak against petitioner and that "things looked good" for petitioner. RT 14:2302. These comments were not injurious to the petitioner—but were rather in favor of or at least neutral towards the petitioner. *See Hernandez v. Poole*, 109 F. Supp. 2d 1177, 1184 (9th Cir. 2000) (denying habeas relief where the juror in question was "in favor of petitioner and not against her"); *Beverly v. Conner*, 330 F. Supp. 18, 21 (S.D. Ga. 1971) (finding no prejudice to defendant where juror's questions reflected "contemptuous opinions of the plaintiff's character"); *Harris v. Haeberlin*, No. 3:03CV-P754-H2005, U.S. Dist. LEXIS 46537, at *32 (W.D. Ky. Mar. 17, 2005) (finding no prejudice and denying habeas relief where juror's questions to defense counsel "indicated a preconception on this juror's part in [p]etitioner's favor").[7]

---

[6] However, if the defendant shows sufficiently improper contact, the burden shifts to the government to prove that the contact was harmless. *Id*. at 968. If the government cannot show harmlessness, the "court must grant a new trial." *Id*. at 959. If the "presumption arises but the prejudicial effect of the contact is unclear from the existing record, the trial court must hold a hearing to determine the circumstances of the juror's conduct, the impact on the jury and the existence of prejudice." *See id*.; *Clark v. Chappell*, 936 F.3d 944, 994 (9th Cir. 2019) (remanding on juror misconduct issue using *Godoy* framework).

[7] The identity of the outside person is also considered—with contact between the juror and government officials, law enforcement, victims, and witnesses being viewed as more prejudicial. *See Tarango v. McDaniel*, 837 F.3d at 949. We also consider factors like the length of the contact and any evidence of juror impact. *See Caliendo v. Warden of Cal. Men's Colony*, 365

10

Given that the juror's comments were favorable toward petitioner, we find that petitioner did not present evidence of juror contact that affected the outcome of the case. *See Godoy*, 861 F.3d at 967. The burden did not shift to the state to prove that the juror contact was harmless. *Id*. at 968.[8]

### B. Jury Instructions (Claims 2, 3)

Petitioner claims that the jury should have been instructed to consider a lesser included offense, *see* ECF No. 1 at 17, and that the supplemental *Moore* instruction given to the jury upon deadlock was coercive, *id*. at 26.

Generally, claims of instructional error raise questions of state law and are not cognizable on federal habeas review. "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules . . . .")). A petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997) (citing *Melugin v. Hames*, 38 F.3d 1478, 1482 (9th Cir. 1994)).

To prevail on a collateral attack against state-court jury instructions, a petitioner must do more than prove that an instruction was erroneous. *See Henderson v. Kibbe*, 431 U.S. 145, 154

---

F.3d 691, 697 (9th Cir. 2004). Even "contact about the case may be insufficient to trigger the presumption if the surrounding circumstances show the contact was innocuous." *Godoy*, 861 F.3d at 968.

[8] Even if petitioner had presented evidence of "sufficiently improper" juror contact, the trial court held a hearing on petitioner's post-conviction motion for a new trial based on juror misconduct. *See Godoy*, 861 F.3d at 956; *Remmer*, 347 U.S. at 229-30. Under *Remmer*, upon the presentation of sufficiently improper juror contact, the court is required to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id*. at 230. Petitioner got such a hearing. At petitioner's hearing on his motion for a new trial, all interested parties were permitted to participate and argue their positions. RT 14:2307. Petitioner submitted a declaration from Williams that contained information relevant to his claims. RT 14:2309. Based on this declaration, the trial court found no "cause to believe that there was tampering of the jury or that there was . . . anything negative or wrong that was going on . . . by the juror." *Ellis*, 2015 WL 159251, at *5. The trial court engaged in a lengthy discussion of the issues presented and placed its reasoning on the record. *Id*.

(1977). The petitioner must prove that the improper instruction "by itself so infected the entire trial that the resulting conviction violated due process." *Estelle*, 502 U.S. at 72 (internal citations omitted). If the court is convinced that the error did not influence the jury, or had little effect, the judgment should stand. *See O'Neal v. McAninch*, 513 U.S. 432, 437 (1995). A federal court's review of a claim of instructional error is highly deferential. *See Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993). A reviewing court may not judge the instruction in isolation but must consider the context of the entire record. *See id*. The mere possibility of a different verdict is too speculative to justify a finding of constitutional error. *See Henderson*, 431 U.S. at 157.

### 1. Imperfect Self-Defense Instruction

Petitioner claims that his constitutional rights were violated when the trial court failed to instruct the jury to consider the lesser included offense of "imperfect self-defense attempted voluntary manslaughter." ECF No. 1 at 17. Self-defense was not a theory advanced by Ellis during trial and his attorney did not argue self-defense in his closing argument. RT 11:1817-1828. Even so, the trial court gave a general self-defense instruction, CALCRIM No. 3470. Petitioner argues that the court should also have given an imperfect self-defense instruction, and that without it the prosecution was relieved of the requirement to prove all the elements of the crime beyond a reasonable doubt. *See* ECF No. 1 at 17.[9]

Petitioner's claim fails. To the extent that petitioner claims that the absence of a lesser included offense instruction violated his federal constitutional rights, there is no support for his claim in Supreme Court precedent. While the Supreme Court has held that a defendant has the right to a lesser included offense instruction in a capital case, this right has not been extended to defendants in non-capital cases. *See Beck v. Alabama*, 447 U.S. 625, 638 (1980).[10] Here,

---

[9] Petitioner's claims of California constitutional violations in jury instructions are not cognizable under federal habeas corpus review. Federal habeas review is limited to "deciding whether a conviction violated the Constitution, laws or treaties of the United States," *Estelle v. McGuire*, 502 U.S. 62, 68 (1991), or determining whether a state court decision was based on an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

[10] *See also United States v. Begay*, 673 F.3d 1038, 1045 (9th Cir. 2011) (reasoning on direct appeal that murder defendant was not automatically entitled to jury instruction on heat of passion); *United States v. Rivera-Alonzo*, 584 F.3d 829, 834 n.3 (9th Cir. 2009) (noting that no

12

petitioner was not charged with any capital crimes.

However, a jury instruction can violate the Constitution's due process guarantee if it relieves the government of its obligation to "prove every element of the offense" beyond a reasonable doubt. *See Dixon v. Williams*, 750 F.3d 1027, 1032 (9th Cir. 2014). Here, contrary to petitioner's claims, the instruction did nothing to relieve the prosecution of the burden of proving all elements of the charged offenses. The court instructed the jury on self-defense, and therefore tasked the jury with considering whether self-defense played a role in the case. An additional instruction of imperfect self-defense would not have changed the prosecution's burden of proof for the charged offenses and lesser included crimes.[11]

### 2. Supplemental *Moore* Instruction

Next, petitioner argues that the supplemental *Moore* instruction was coercive, in violation of his constitutional rights. Coercive jury instructions deny the defendant his federal constitutional rights. *Lowenfield v. Phelps*, 484 U.S. 231, 233 (1988). The coerciveness of a jury instruction is assessed by considering the totality of the circumstances. *Id*. The use of a "supplemental charge," such as an *Allen* charge, "has long been sanctioned." *Id.* at 238 (characterizing the *Allen* charge as a long-approved instruction intended to secure jury unanimity). In *Allen*, the judge asked the jurors to consider opposing views and question the reasonableness of their own views. *Allen v. United States*, 164 U.S. 492 (1896). California's *Moore* instruction is similar to an *Allen* instruction and is used by judges when juries are deadlocked. *Moore*, 96 Cal. App. 4th at 1105.

Here, after approximately four hours of deliberation, the jury sent a note to the trial court judge stating that it could not reach a verdict on counts 1, 2, and 3. *Ellis*, 2015 WL 159251, at

---

constitutional right to lesser-included offense instructions exists in non-capital cases).

[11] Even if petitioner had a right to a lesser included offense instruction here, the evidence presented at trial did not support an instruction on imperfect self-defense. An imperfect self-defense voluntary manslaughter instruction is appropriate when the evidence supports a finding that the defendant had an "actual but unreasonable belief that [he] was in imminent danger of death or great bodily injury." *People v. Booker*, 51 Cal. 4th 141, 182 (2011). Here, scant evidence was presented to support the view that petitioner had an actual, but unreasonable, belief that he was in imminent danger.

*10. The trial judge suggested that a supplemental *Moore* instruction be read to the jury. *See People v. Moore*, 96 Cal. App. 4th 1105 (2002) (finding a supplemental jury instruction to deadlocked jurors permissible). Ellis's attorney agreed to this instruction, stating "your Honor, it is really up to you. I don't have any objection to the reading . . . the *Moore* jury instruction, I think that it helps sometimes." *Ellis*, 2015 WL 159251, at *10.

The judge then instructed the jurors as follows:

> To assist you in your further deliberations, I am going to further instruct you as follows:
>
> Your goal as jurors should be to reach a fair and impartial verdict if you're able to do so based solely on the evidence presented, and without regard for the consequences of your verdict, regardless of how long it takes to do so. It is your duty as jurors to carefully consider, weigh and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors. In the course of your further deliberations you should not hesitate to reexamine your views or request your fellow jurors to reexamine theirs. You should not hesitate to change the view you once held if you are convinced it is wrong, or to suggest other jurors change their views if you are convinced they are wrong. Fair and [ef]fective jury deliberations require a frank and forthright exchange of views. As I previously instructed each of you, you must decide the case for yourself. You should do so only after a full and complete consideration of all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment.
>
> Both the People and [Ellis] are entitled to the individual judgment of each juror. As I previously instructed[,] you have the absolute discretion to conduct your deliberations in any way you deem appropriate. May I suggest that since you have not been able to arrive at a verdict using the methods you have chosen, that you consider to change the methods you have been following at least tempora[ri]ly, and try any new methods. For example, you may wish to consider having different jurors lead the discussions for a period of time. Or you may wish to experiment with reversed role playing, by having those on one side of an issue present and argue the other side[']s position and vice versa. This might enable you to better understand the other[']s positions. By suggesting you should consider the changes in your methods of deliberations, I want to

14

> stress I am not dictating nor instructing you as to how to conduct
> your deliberations. I merely find—you may find it productive to do
> whatever is necessary to ensure each juror has a full and fair
> opportunity to express his or her views, and consider and
> understand the views of the other jurors.
>
> I will again ask that you retire to the jury room, continue your
> deliberations, please advise the Court when you have reached a
> verdict, or like I have previously advised you[, o]nce you have
> considered the matter, and if you're still in your position, then let
> me know and I will call you back in. Okay, if you would please
> retire to the jury room, thank you. Thank you, we're in recess."

*Ellis*, 2015 WL 159251, at *10-11 (alterations in original).

In determining whether a constitutional violation occurred, the totality of the circumstances must be considered in context. *Lowenfield*, 484 U.S. at 250; *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam). Signals of coercive jury instructions include: (1) a short amount of time elapsed between the supplemental instruction and the verdict, *United States v. United States Gypsum Co.*, 438 U.S. 422, 462 (1978); (2) a judge ordering the jury to reach a verdict, *Jenkins*, 380 U.S. at 446; and (3) a judge polling the jurors on their numerical division. *Brasfield v. United States*, 272 U.S. 448 (1926).

The jury deliberated for one hour after the supplemental instruction. This is twice the time found to be acceptable in *Lowenfield* and it does not give rise to an inference of coercion here. Next, the judge provided the *Moore* instruction, directing the jury to "deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment." *Ellis*, 2015 WL 159251, at *10-11. This instruction left open the possibility that the jurors could continue to disagree, with no consequences. Defense counsel did not object to the *Moore* instruction. Finally, the judge did not poll the jurors about their numerical divisions, unlike in *Brasfield*. *Brasfield*, 272 U.S. at 450. Therefore, in consideration of the totality of the circumstances, we find no coercion in the supplemental *Moore* instruction given here.

### C. Cumulative error

Finally, petitioner contends that individual errors had the cumulative effect of making his trial fundamentally unfair. Petitioner does not develop this argument; he does not explain how

the alleged errors worked together to give rise to a violation of federal law. This court will not construct an argument for petitioner. We find no merit in petitioner's claims, whether considered separately or together. Cumulatively, he has not shown grounds for habeas relief.

Even if petitioner had stated a cognizable habeas claim under federal law, any errors, either individually or cumulatively, would be harmless. The standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993), governs our harmless-error inquiry. *See Dixon v. Williams*, 750 F.3d 1027, 1034 (9th Cir. 2014) (per curiam). Under *Brecht*, a petitioner can obtain federal habeas relief only if "the error had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637. To satisfy this standard, the court must have "grave doubt" as to the outcome, meaning that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *See O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). Here, error, if any, did not have a substantial effect in determining the verdict.

### III. Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253; *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order adverse to a petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made a substantial showing of the denial of a constitutional right. Thus, the court should decline to issue a certificate of appealability.

## IV. Findings and Recommendations

We recommend that the court deny the petition for a writ of habeas corpus, ECF No. 1, and decline to issue a certificate of appealability.

These findings and recommendations are submitted to the U.S. District Court Judge presiding over this case under 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within fourteen days of the service of the findings and recommendations, petitioner may file written objections to the findings and recommendations with the court and serve a copy on all parties. That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations." The District Judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

IT IS SO ORDERED.

Dated: March 30, 2020

UNITED STATES MAGISTRATE JUDGE

No. 206.